UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Ahmad El Boutary,<br><br>        *Plaintiff*,<br><br>– against –<br><br>The City of New York, *et al.*,<br><br>        *Defendants*. | **1:18-CV-3996 (ARR) (JO)**<br><br>**Not for Publication**<br><br>**Opinion & Order** |

ROSS, United States District Judge:

The plaintiff, a New York City for-hire-vehicle driver, had his taxicab license summarily suspended after the press reported that he had ejected a same-sex couple from his car. He fought the suspension, and received his license back about a month later, after an administrative law judge credited his version of the facts over his passengers'. Meanwhile, he brought suit against the city, New York City Taxi and Limousine Commission Chair Meera Joshi, TLC Deputy Commissioner of Public Affairs Allan Fromberg, TLC Prosecution Unit Assistant Commissioner Mohammed Akinlolu, and TLC Supervising Attorney Mark Wheeler on a number of claims relating to the summary suspension of his license. The plaintiff now seeks a ruling from this court that the suspension of his license violated his due-process rights as well as TLC regulations. At the same time, the defendants seek to dismiss the complaint in its entirety. For the reasons discussed below, I find that there is an insufficient record to grant summary judgment on any of the claims, and I dismiss certain of the plaintiff's causes of action for failure to state a claim.

## BACKGROUND

On June 9, 2018, two women hired the plaintiff, then operating as a driver for the Uber ridesharing service, to drive them from a bar in Brooklyn to another bar in Manhattan. Defs.' 56.1 Resp. ¶ 12, ECF No. 42. The women had been drinking, and at some point during the ride kissed. *See id.* ¶¶ 13, 37. What else happened in the car is a matter of considerable dispute; according to the plaintiff, "the women were drunk, kissing repeatedly and aggressively and refused to stop when he asked them to do so." Am. Compl. ¶ 18, ECF No. 12.[1] Whatever the case, after crossing into Manhattan, the plaintiff prematurely parked the car and asked his passengers to get out. Defs.' 56.1 Resp. ¶ 14.

The passengers did not welcome this suggestion, and all three individuals were soon arguing on the sidewalk, in an exchange that one of the passengers, Alex Iovine, partially captured with her cell-phone camera. *See id.* ¶ 15; Alex Iovine, *Lesbian Couple Says Uber Driver Kicked Them Out over a Kiss*, N.Y. Post (June 11, 2018), http://players.brightcove.net /4137224153001/ed38fae1-4db1-4308-8095-399a04010bc1_default/index.html?videoId= 5796338363001.[2] The video begins with the plaintiff being asked, "is there an issue?," to which

---

[1] The passengers, by contrast, have maintained that they merely exchanged a "brief kiss." Hr'g Tr. 38–39, ECF No. 37-3; *accord id.* at 75.

[2] Neither party has submitted the video to this court. Nevertheless, the amended complaint refers to and relies on the contents of the video repeatedly (*see* Am. Compl. ¶¶ 20–24, 26–27, 45–49); the video was introduced into evidence in a related administrative hearing (*see* Defs.' 56.1 Resp. ¶ 34), the transcript of which, including a transcript of the video itself, when played during that hearing, *is* in the record in this case (*see, e.g.*, Hr'g Tr. 77–80); static copies of two webpages in which the video is embedded are also in the record in this case (*see* Press Reports 1, 6, ECF No. 37-6); and the administrative-hearing transcript and the undisputed facts (*see* Defs.' 56.1 Resp. ¶ 15) confirm that the video presently available on the live versions of those webpages accurately portrays events at issue in this case. Accordingly, I deem the video incorporated by reference into the amended complaint and rely on it herein. *See, e.g.*, *Cromwell-Gibbs v. Staybridge Suite Times Square*, No. 16 Civ. 5169 (KPF), 2017 WL 2684063, at *1 n.2 (S.D.N.Y. June 20, 2017) (incorporating document by reference where "Amended Complaint clearly, definitely, and substantially references" it and court "is confident that [the document] is authentic, accurate, and relevant").

he responds that he told the passengers "[the] first time, don't do it" but they "did it again." Iovine, *supra*; *see also* Hr'g Tr. 77, ECF No. 37-3. The plaintiff and the passengers then argue about whether kissing is allowed in Uber vehicles. *See* Hr'g Tr. 77–79; Iovine, *supra*. Eventually, the plaintiff seems to realize that he is being recorded, and he says "don't" while reaching out his arm—evidently toward the other passenger, Emma Pichl, who is outside the frame. *See* Iovine, *supra*; *see also* Hr'g Tr. 79.[3] Then, while the plaintiff's hand and Pichl are out of view, Iovine says, "get off of her phone; don't fucking touch her," and Pichl says, "don't fucking touch my phone." Iovine, *supra*; *see also* Hr'g Tr. 79. Next, Iovine promises the plaintiff that she's "gonna get [him] fired." Iovine, *supra*; *see also* Hr'g Tr. 79. The passengers disagree with each other over whether to report the plaintiff to Uber or to call the police, to which the plaintiff ultimately says, "report me, report me, I don't give a shit." Iovine, *supra*; *see also* Hr'g Tr. 80. All three individuals are clearly agitated throughout the incident, and they all occasionally raise their voice, but I would not characterize any of the three as yelling. *See* Iovine, *supra*.

Iovine uploaded the video to the Web on June 10, 2018, and by the next day both the New York Daily News and the New York Post had published stories on the incident online, with copies of the video embedded in their websites. Defs.' 56.1 Resp. ¶ 15. Their coverage highlighted that the passengers were a "lesbian couple" and reported that they were kicked out of the car "for kissing." Press Reports 1, 6, 8, ECF No. 37-6.

In reporting the story, the tabloids reached out to the TLC for comment. *See* Defs.' 56.1 Resp. ¶¶ 16–17. The Post quoted defendant Fromberg, who is responsible for TLC public relations, as saying that "[a] driver is most definitely not allowed to do such a thing. There is a

---

[3] Pichl testified at the administrative hearing that she had taken her phone out to record the incident but ultimately put her phone away without recording. *See* Hr'g Tr. 40, 49. The only known recording of the incident is Iovine's video.

list of circumstances that are grounds for refusing service to a passenger, and what happened is most definitely not among them." *Id.* ¶ 17; Press Reports 7. Fromberg was also quoted by CNN as saying that "[the] blatantly discriminatory behavior described by the complainant is repugnant, and will not be tolerated in the City of New York." Defs.' 56.1 Resp. ¶ 17; Press Reports 11.

After reading about the incident in the press, TLC officials decided to investigate and contacted the passengers. *See* Defs.' 56.1 Resp. ¶¶ 18, 22. What the passengers told the TLC is not entirely clear. Iovine later testified at an administrative hearing that she "might have" told "[t]he TLC that [the plaintiff] grabbed [her] girlfriend." Hr'g Tr. 107.[4] Pichl's testimony at the hearing was similarly ambiguous:

> Q: Did your girlfriend tell the TLC that [the plaintiff] used physical force against you?
>
> A: Well, he was across there, trying to come at my arm again, like I said before. Yeah, so we said that.

*Id.* at 52. By contrast, the amended complaint alleges that "the passengers did not tell the TLC that Mr. El Boutary grabbed the passenger's arm, or that he cursed at the passenger." Am. Compl. ¶ 51.

Whatever was said, a TLC "For Hire Vehicle Complaint" report was generated in the afternoon of June 11, 2018, in the name of Alex Iovine. *See* TLC FHV Complaint, ECF No. 37-7. The details of the complaint, in their entirety, are as follows: "driver abruptly pulled over and kicked passenger and her girlfriend out of the car. He yelled at them for being disrespectful and inappropriate because of pecked [sic] on the lips." *Id.* Defendant Wheeler explained at the administrative hearing that this complaint "wasn't filed the day of" the incident but rather "[t]he complaint was based upon the press" (Hr'g Tr. 7)—"[a]nother employee of the TLC,

---

[4] She subsequently testified that she "told [the TLC] that he *tried to* grab [her] girlfriend's arm." Hr'g Tr. 108 (emphasis added).

Marina Gubenko, spoke to the witnesses as a preliminary matter to initiate the 311 complaint" (*id.* at 15). Iovine confirmed at the hearing that she did not file a complaint with the TLC and testified that she did not recognize the complaint report. *See id.* at 104–05.

On June 12, 2018, the TLC served the plaintiff with a notice stating that, "pursuant to TLC Rule 68-15(a)(1), [his] TLC license was **SUSPENDED** on June 12, 2018, based upon the Chairperson's determination that emergency action [was] required to insure public health or safety."[5] Directive & Notice of Summ. Suspension, ECF No. 31-1;[6] *see* Defs.' 56.1 Resp. ¶ 21. The only specific allegations contained in the notice were that the plaintiff "refuse[d] to provide service to a passenger on the basis of her sexual orientation." Directive & Notice of Summ. Suspension. The notice was signed by Wheeler (*see id.*), who stated at the administrative hearing: "In terms of the suspension policy and the choice to proceed as a revocation matter, that was, I guess, [defendant] Mohammed Akinlolu, my boss. But I don't know who maybe told him that it should be handled that way. He, of course, has bosses higher up" (Hr'g Tr. 16). The plaintiff alleges that the TLC chair, defendant Joshi, "made no determination that Mr. El Boutary's licensure presented any threat" but that "the decision to suspend was made by Mr. Akinlolu, Mr. Wheeler's supervisor." Am. Compl. ¶¶ 36, 43.

The TLC then sent the plaintiff another letter, dated June 13, 2018, informing him that the TLC had "initiated a Petition against [him]." Defs.' 56.1 Resp. ¶ 26; Notice of Settlement Conf. & Pet. 1, ECF No. 37-9. The petition attached to that letter recited the various violations alleged to have been committed by the plaintiff; namely, that he "acted against the best interests of the public by refusing to provide service to a passenger on the basis of sexual orientation"; that he "threatened, harassed, and abused a passenger by yelling and cursing at

---

[5] The cited rule states that "[t]he Chairperson can summarily suspend a License if the Chairperson believes that continued licensure would constitute a direct and substantial threat to public health or safety, pending revocation proceedings." 35 N.Y.C.R.R. § 68-15(a)(1). More on that later.

[6] This document is incorporated by reference into the amended complaint. *See* Am. Compl. ¶ 35.

the passenger"; that he "used physical force against a passenger by grabbing at that passenger[']s phone, and swinging his hand at the passenger"; and that he "refused to provide service to a passenger after accepting a prearranged trip." Notice of Settlement Conf. & Pet. 2. This petition was dated June 12, 2018, and signed by one Andrew Rabin, a TLC attorney, on behalf of Akinlolu. *See id.* at 3.

Another letter from the TLC to the plaintiff, dated June 15, 2018, notified him that a hearing regarding the summary suspension of his license was scheduled for June 21, 2018. *See* Notice of Rescheduled Summ. Suspension Hr'g 1, ECF No. 37-8. Attached to this letter was another petition, also signed by Rabin on behalf of Akinlolu, and dated June 13, 2018. *See id.* at 3. This petition contained three allegations:

> 1. After accepting a prearranged trip and initiating that trip, [the plaintiff] refused to continue to provide service to a passenger on the basis of that passenger's sexual orientation.
>
> 2. [The plaintiff] grabbed the passenger's arm and grabbed at the passenger[']s cellular phone.
>
> 3. [The plaintiff] cursed at the passenger, argued with the passenger and yelled at the passenger.

*Id.* "Accordingly," the petition concluded, "the continued licensure of [the plaintiff] would constitute a direct and substantial threat to public health or safety." *Id.*

The hearing took place, as scheduled, on June 21, 2018, at the city Office of Administrative Trials and Hearings. Defs.' 56.1 Resp. ¶ 30. Pichl, Iovine, and the plaintiff all testified at the hearing, Wheeler represented the TLC, and Iovine's video of the incident was introduced into evidence. *See id.*; Hr'g Tr. 2–3. After the hearing, on July 9, 2018, the presiding administrative law judge issued a report and recommendation "recommend[ing] lifting the suspension of [the plaintiff's] TLC license." R. & R. 13, ECF No. 31-7;[7] *accord* Defs.' 56.1 Resp.

---

[7] This document is incorporated by reference into the amended complaint. *See* Am. Compl. ¶¶ 54–56.

¶ 44. Specifically, the ALJ concluded (1) that there was "no evidence that [the plaintiff's] actions were motivated by the sexual orientation of complainants"—and that a sexual-orientation-based service refusal would not have justified a summary suspension of the plaintiff's license anyway—(2) that there was no "credible evidence to support the[ ] allegation that [the plaintiff] grabbed Ms. Pichl's arm," (3) that the "facts are in dispute" and the TLC failed to establish that the plaintiff "reached for Ms. Pichl's cell phone," and (4) that there was no "evidence sufficient to support the[ ] allegation that [the plaintiff] violated TLC rules by yelling at, or arguing with[,] either passenger." R. & R. 11–13; *see also* Defs.' 56.1 Resp. ¶¶ 42, 44.

On July 16, 2018, the TLC informed the plaintiff that it had accepted the ALJ's recommendation and was reinstating the plaintiff's license. *See* Defs.' 56.1 Resp. ¶ 45.

The operative complaint in this action was filed on July 26, 2018. *See* Am. Compl. It states four causes of action: (1) that the plaintiff was unconstitutionally deprived of notice and an opportunity to be heard before his license was suspended, (2) that the applicable TLC regulations did not provide fair warning that his license could be summarily suspended, (3) that the defendants violated those regulations, and (4) that Fromberg defamed the plaintiff in his statements to the media. *See id.* ¶¶ 70–89. The defendants answered the amended complaint on August 9, 2018. *See* Answer, ECF No. 18. The case is now before me on cross-motions: the plaintiff has moved for summary judgment on every claim but the defamation claim (*see* Pl.'s Notice of Mot., ECF No. 35), and the defendants have moved to dismiss the complaint in its entirety under Federal Rule of Civil Procedure 12(c) (*see* Defs.' Notice of Mot., ECF No. 30).

# DISCUSSION

## A.    The Legal Standards

"A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995). "[I]n assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." *Id.* Hence, in the context of the plaintiff's motion, "[t]he inferences to be drawn from the underlying affidavits[ and] exhibits . . . must be viewed in the light most favorable to" the defendants. *Id.*

As for the defendants' motion, "'[i]n deciding a Rule 12(c) motion, [I] apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party,' unless the allegations are 'supported by mere conclusory statements.'" *Hayden v. Paterson*, 594 F.3d 150, 157 n.4 (2d Cir. 2010) (first quoting *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999); then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Where, as here, the movant presents matters outside the pleadings, "the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment." *Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 381 (S.D.N.Y. 2013). The court has "complete discretion" over this determination. *Viti v. Guardian Life Ins. Co. of Am.*, 817 F. Supp. 2d 214, 223 (S.D.N.Y. 2011) (quoting *Carione v. United States*, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005)). Because I find that converting the defendants' motion would not be useful, in ruling on that motion I rely solely on the pleadings and on documents

"incorporated into the pleadings by reference." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).

## B. Procedural Due Process

The constitutional guarantee of due process means that, in general, "individuals must receive notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993).[8] "The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment— to minimize substantively unfair or mistaken deprivations of property . . . ." *Id.* at 53 (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80–81 (1972)). Thus, government may dispense with "predeprivation notice and hearing . . . only in 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Id.* (quoting *Fuentes*, 407 U.S. at 82). Such extraordinary situations exist only where there is (1) "[a]n important government interest," (2) "a substantial assurance that the deprivation is not baseless or unwarranted," and (3) a need for "prompt action." *Gilbert v. Homar*, 520 U.S. 924, 930–31 (1997) (quoting *FDIC v. Mallen*, 486 U.S. 230, 240 (1988)).

The plaintiff argues that his right to procedural due process was denied when his for-hire-vehicle license was suspended by the TLC, for what he says amounted to nothing more than a service refusal, without the TLC getting his side of the story first. *See* Pl.'s Br. 13–17, ECF No. 36. By contrast, the defendants argue that the postdeprivation hearing that the plaintiff received was constitutionally adequate and that "prompt action" had to be taken "to ensure the safety of the riding public." Defs.' Br. 13, ECF No. 32.

---

[8] "[T]axicab drivers have a property interest in their taxicab licenses sufficient to trigger due process protection." *Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 276 (E.D.N.Y. 2002), *aff'd*, 60 F. App'x 861 (2d Cir. 2003).

To resolve the parties' motions on this claim, I must look to "[t]he three-part inquiry set forth in *Mathews v. Eldridge*, [424 U.S. 319 (1976)]." *James Daniel*, 510 U.S. at 53; *accord Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (citing *Krimstock v. Kelly*, 306 F.3d 40, 60 (2d Cir. 2002)). Under *Mathews*, I "consider the private interest affected by the official action; the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards; and the Government's interest, including the administrative burden that additional procedural requirements would impose." *James Daniel*, 510 U.S. at 53.[9] In the discussion below, I first conclude that the plaintiff has adequately stated a claim that his due-process rights were violated, before finding that too many facts remain in dispute to grant summary judgment and finding that the claim must be dismissed against certain defendants.

### 1. The plaintiff has stated a claim.

*a.* The first factor under the *Mathews* test is "the private interest that will be affected by the official action" (*Mathews*, 424 U.S. at 335)—here, the plaintiff's interest in his for-hire-vehicle license. The defendants do not dispute that "[t]he plaintiff's interest in the continued possession and use of his FHV license" is "substantial." Defs.' Br. 10 (citing *Padberg v. McGrath-McKechnie*, 108 F. Supp. 2d 177, 187 (E.D.N.Y. 2000)). If anything, that is an understatement.

---

[9] Before I engage in the *Mathews* analysis, I briefly dispense with a threshold argument made by the plaintiff—namely, that this issue was already decided, in *Padberg, supra*, and thus that the defendants are collaterally estopped from urging a contrary result. *See* Pl.'s Br. 11–12. *Padberg* involved a procedural-due-process challenge to summary suspensions of taxi licenses for unjustified service refusals—that is, for the license-holders' refusing to accept prospective passengers who had hailed them on the street. *See* 203 F. Supp. 2d at 267, 272. By contrast, not only is ejecting a passenger midtrip distinguishable from refusing service at the outset, but the plaintiff here was also accused of "grabb[ing] [his] passenger's arm," "curs[ing] at the passenger," and "yell[ing] at the passenger," among other things (Notice of Rescheduled Summ. Suspension Hr'g 3). One of the basic requirements for the application of collateral estoppel is that the issue precluded and the "issue . . . raised in a previous proceeding" be "identical." *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997) (citing *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995)). Because that requirement is plainly not met, collateral estoppel does not apply.

*See Nnebe*, 644 F.3d at 159 ("[T]he private interest at stake here is enormous—most taxi drivers 'rely on the job as their primary source of income' and 'often earn the sole income for large families in a city where the cost of living significantly exceeds the national average.'" (quoting amicus brief)); *Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 277 (E.D.N.Y. 2002) ("Plaintiffs' interest in their taxicab license is profound. Suspending their [licenses] does far more than inconvenience drivers; it deprives them of their very livelihood."), *aff'd*, 60 F. App'x 861 (2d Cir. 2003).

But "in determining what process is due, account must be taken of 'the *length*' and '*finality* of the deprivation.'" *Gilbert*, 520 U.S. at 932 (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982)). For if "the suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial." *Id.* Thus in *Padberg*, Judge Raymond J. Dearie of this district found that the taxi driver's private interest was all the weightier in light of "the duration of the summary suspension," where TLC rules at the time provided for only a "*pro forma*" "hearing within ten days" but did "nothing to limit the duration of the suspension" by mandating a prompt "full hearing on the merits." *Padberg*, 203 F. Supp. 2d at 278.

Here, the defendants argue that the plaintiff's interest is less than in *Padberg* because current TLC rules guaranteed him a prompt postdeprivation hearing on the merits. *See* Defs.' Br. 10–11.[10] And in fact, the plaintiff's hearing occurred only nine days after his license was

---

[10] The defendants argue that the holding in *Padberg* was "principally based on deficiencies in the post-deprivation review procedures afforded drivers whose licenses had been summarily suspended." Defs.' Br. 14. Not so. Judge Dearie was explicit that he was addressing "two separate questions": " whether it was a violation of due process to deprive plaintiffs of their licenses prior to a hearing" and "*if a presuspension hearing was not constitutionally mandated*, whether the procedures followed by the TLC in the postsuspension hearings were sufficient to protect plaintiffs' due process rights." 203 F. Supp. 2d at 277 (emphasis added). And he ruled both that "depriving the plaintiffs of a presuspension hearing violated their due process rights" *and* that, "[m]oreover, even if due process were not to require a presuspension hearing under these circumstances, the

suspended. *See* Defs.' 56.1 Resp. ¶ 30; Directive & Notice of Summ. Suspension; *cf. Padberg*, 203 F. Supp. 2d at 278 ("[I]n the case of plaintiff Ahmed, it was not until nearly three months [later] . . . that Ahmed was given a full hearing on the merits before an OATH judge."). But of course it was thirty-four days—more than a month—before the plaintiff's license was restored to him, even with the "prompt" hearing that he was afforded. *See* Defs.' 56.1 Resp. ¶ 45. The plaintiff's deprivation may have been less than in *Padberg*, but the undisputed facts show that it was substantial nonetheless.

*b.* The second factor under the *Mathews* test is "the risk of an erroneous deprivation . . . through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. The plaintiff argues that the risk of error in this case was large because the TLC's investigation was based on "tabloid news stories . . . and omit[ted] even a conversation with the driver." Pl.'s Br. 14. By contrast, the defendants argue that the "contemporaneous video of the altercation provided a reasonably reliable basis for TLC's summary suspension of plaintiff's license." Defs.' Br. 12.

On the facts described in the plaintiff's complaint, "the risk of error inherent in the truthfinding process" (*Mathews*, 424 U.S. at 344) was clear. After hearing from the media about an altercation of which they had no first-hand knowledge (*see* Defs.' 56.1 Resp. ¶ 22), TLC officials allegedly reached out to and took a statement from the passengers without inquiring into the plaintiff's account of the incident (*see* Am. Compl. ¶ 31). *Cf. Padberg*, 203 F. Supp. 2d at 278 (observing "the obvious possibility for error" where drivers "are stripped of their

---

procedures followed in the summary suspension hearings were inadequate." *Id.* at 281. It's true that the meager summary-suspension hearings factored into his private-interest analysis, as noted above (*see also id.* at 278), but in no way did the decision hinge on them. Finally, Judge Dearie did observe that "the availability of prompt, meaningful postsuspension procedures" has been "critical" to Supreme Court decisions upholding "summary suspensions without a hearing" (*id.* at 279), but the acknowledgment that meaningful postdeprivation review is *necessary* to forgo predeprivation procedures does not imply that it is sufficient.

licenses before they are afforded the opportunity to present their side of the story").[11] TLC officials thus would have had no way of knowing whether the passengers' allegations of wrongful conduct were true or false. Although the defendants argue that they had seen "video corroborating portions of the passengers' account" (Defs.' Opp'n 8, ECF No. 41), that video was recorded by the passengers themselves (*see* Defs.' 56.1 Resp. ¶ 15), and the passengers were therefore undoubtedly familiar with it. What is more, having reviewed the video, I agree with the ALJ's assessment that "[a]t no point during the video does [the plaintiff] grab anyone, touch anyone's cell phone, . . . or yell at either passenger. Nor does [the plaintiff] mention the sexual orientation of either passenger" (R. & R. 8). The video thus corroborates nothing more than that the plaintiff argued with and refused service to the passengers because they had kissed. As to every other charge against the plaintiff, the TLC allegedly relied solely on the passengers' word.

As Judge Dearie explained in *Padberg*, "[i]t is the subjective nature of the evidence . . . that distinguishes this case from other cases where predeprivation hearings were not required." 203 F. Supp. 2d at 278. The defendants cite *Gilbert* for the proposition that government may dispense with a predeprivation opportunity to be heard in certain "limited cases" (Defs.' Br. 11 (quoting *Gilbert*, 520 U.S. at 930–31)), but this case is not one of them. For it lacks the "substantial assurance that the deprivation is not baseless or unwarranted" that was necessary to the Court's holding in *Gilbert*, 520 U.S. at 931.

In *Gilbert*, the plaintiff, a state employee, was suspended from his job, without notice or an opportunity to be heard, after he was arrested and criminally charged. *See id.* at 926–27. The Supreme Court ruled that his due-process rights were not violated, in part because "the purpose of any pre-suspension hearing would be to assure that there are reasonable grounds

---

[11] What efforts, if any, the TLC made to contact the plaintiff before suspending his license are not in the record. I observe that the Daily News successfully interviewed him. *See* Hr'g Tr. 175; Press Reports 4.

to support the suspension" (*id.* at 933 (emphasis omitted)), and the "arrest and charge" themselves sufficiently "assure[d] that the state employer's decision to suspend the employee [was] not 'baseless or unwarranted,' in that an independent third party ha[d] determined that there [was] probable cause to believe that the employee committed a serious crime" (*id.* at 934 (quoting *Mallen*, 486 U.S. at 240)). Similarly, in *Mackey v. Montrym*, 443 U.S. 1 (1979), the Court upheld a "statute that mandate[d] suspension of a driver's license [for] . . . refus[ing] to take a breath-analysis test upon arrest for driving while under the influence," because "the predicates for a driver's suspension" were "objective facts either within the personal knowledge of an impartial government official or readily ascertainable by him." *Id.* at 3, 13. "At the very least," the Court added, "the arresting officer ordinarily will have provided the driver with an informal opportunity to tell his side of the story." *Id.* at 14.

In this case, none of that was true. No impartial government official or independent third party had any personal knowledge of the incident, nor did the plaintiff have even an informal opportunity to tell the TLC his version of events. Assuming the facts alleged in the complaint, I find that the second *Mathews* factor weighs heavily in the plaintiff's favor.

*c.* The defendants rely principally on the weight of the third *Mathews* factor: "the public interest," which "includes the administrative burden and other societal costs that would be associated with" additional process (*Mathews*, 424 U.S. at 347). The defendants do not dispute that "it would be no added [administrative] burden for [the TLC] to provide a hearing before it suspends instead of after" (Pl.'s Opp'n 4, ECF No. 39); rather, they rest their case on societal costs. Specifically, the defendants argue that "it is clear that TLC has a legitimate interest in immediately suspending the license of an individual who has been accused by passengers of harassment and abuse" in order "to protect public health and safety" Defs.' Br. 12–13. The plaintiff agrees that "the Supreme Court has allowed deprivation prior to a hearing in cases

involving pressing and immediate threats to the public health and safety" but asserts that "[h]ere no such threat existed." Pl.'s Br. 16.

The TLC, quite obviously, cannot have its licensed drivers running amok. *See Nnebe*, 644 F.3d at 159 ("[A]mong the most critical functions performed by the TLC are ensuring the safety of the taxi-riding public and maintaining the public's trust in the safety of taxis." (quoting *Nnebe v. Daus*, 665 F. Supp. 2d 311, 324 (S.D.N.Y. 2009)). It is just as obvious, however, that not every alleged misdeed by a taxi driver presents exigent circumstances. *Cf. Padberg*, 203 F. Supp. 2d at 281 ("In this case, . . . the circumstances do not present the sort of immediate threats to public health and safety that would permit summary suspension."). Although there is certainly a public interest in suspending the licenses of rule-breaking drivers, the magnitude of that interest necessarily depends on the severity and dangerousness of the driver's alleged conduct.

Here, that is in dispute. But according to the complaint, "the passengers did not tell the TLC that Mr. El Boutary grabbed [either] passenger's arm, or that he cursed at the passenger[s]." Am. Compl. ¶ 51. Assuming those facts, the third *Mathews* factor plainly does not outweigh the first two. As a result, the defendants' argument that the plaintiff has failed to state a claim must be rejected.[12]

*2. The plaintiff is not entitled to summary judgment.*

For the purposes of the plaintiff's motion, by contrast, I view the evidence in the light most favorable to the defendants; in particular, I assume that the passengers told the TLC that

---

[12] Because the defendants do not raise any due-process arguments particular to the state constitution, the defendants' motion with respect to the plaintiff's claims under the state constitution is similarly denied. *See also Oneida Indian Nation of N.Y. v. Madison County*, 665 F.3d 408, 427 n.13 (2d Cir. 2011) ("With some exceptions, New York courts have interpreted the due-process guarantees of the New York Constitution and the United States Constitution to be coextensive—or assumed that they are.").

the plaintiff had assaulted one of them and was verbally abusive toward them (*see, e.g.*, Hr'g Tr. 52, 107; Notice of Settlement Conf. & Pet. 2; Notice of Rescheduled Summ. Suspension Hr'g 3; Press Reports 6)—conduct that government certainly has an interest in preventing.[13] Additionally, I do *not* assume that the TLC neglected to attempt to contact the plaintiff, because no evidence in the record establishes that allegation. As such, although the first *Mathews* factor carries the same weight with respect to either motion, the second and third factors weigh more heavily in the defendants' favor on the plaintiff's motion. I cannot grant summary judgment to the plaintiff without further development of the record.

To be sure, the bar that the defendants must meet is a high one. The law allows that "process may be postponed until *after* deprivation where an important governmental interest is accompanied by assurances that the deprivation is warranted." *United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 902 (2d Cir. 1992) (citing *Strong v. Bd. of Educ.*, 902 F.2d 208, 212 (2d Cir. 1990)). It is therefore not enough for the defendants to establish simply that the passengers' allegations were severe; they must also demonstrate that the TLC's investigation involved assurances that the allegations were genuine.[14]

---

[13] The plaintiff argues that the TLC's account of the incident was "an exaggeration, as later testimony showed." Pl.'s Opp'n 3. And he points out that the ALJ ultimately found that "he did not yell and uttered no threat." *Id.* But evidence that stems from the administrative hearing is, of course, irrelevant to the question whether the defendants violated the plaintiff's constitutional rights based on the information that they had when his license was suspended.

[14] The defendants' argument that "there is no constitutional violation . . . when there is an adequate state postdeprivation procedure to remedy a random, arbitrary deprivation of property" (Defs.' Br. 13 (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 882 (2d Cir. 1996))) is inapt. The cited rule descends from *Parratt v. Taylor*, 451 U.S. 527 (1981), in which the Supreme Court ruled that no due-process violation occurred when prison officials lost an inmate's property—an act that the Court described as "random and unauthorized"—without first affording the inmate a hearing. *See id.* at 530, 541, 543. As the Court later explained, "[i]n *Parratt*, the very nature of the deprivation made predeprivation process 'impossible.'" *Zinermon v. Burch*, 494 U.S. 113, 129 (1990) (quoting *Parratt*, 451 U.S. at 541). Accordingly, the rule is that "[w]here a deprivation at the hands of a government actor is 'random and unauthorized,' hence rendering it impossible for the government to provide a pre-deprivation hearing, due process requires only a

### 3. *The procedural-due-process claims do not survive against Joshi and Fromberg.*

The plaintiff's procedural-due-process claims survive, but not against all the defendants. Although the plaintiff has failed generally to establish which of the defendants would be liable for his due-process injury, the allegations against Joshi and Fromberg in particular are insufficient even to withstand the defendants' motion for judgment on the pleadings.

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *accord Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016). In the context of an alleged "procedural due-process violation, . . . [a] plaintiff may establish [the defendant's] personal involvement" in one of five ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Warren*, 823 F.3d at 136 (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Here, the plaintiff has alleged simply that Joshi "had sole authority to suspend Mr. El Boutary" (Am. Compl. ¶ 7), that Akinlolu "decided to suspend Mr. El Boutary" (*id.* ¶ 9), and that Wheeler "signed the directive suspending Mr. El Boutary" (*id.* ¶ 10). And the plaintiff has also alleged that unnamed "TLC officials concocted" the accusations against him. *Id.* ¶ 51.

---

post-deprivation hearing." *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (quoting *Parratt*, 451 U.S. at 541). But there is no such allowance "where the defendant state officials had the state-clothed authority to effect a deprivation and had the power to provide the plaintiff with a hearing before they did so." *Zinermon*, 494 U.S. at 116 n.2. Here, there is nothing to suggest that predeprivation process would have been impossible, or that the defendants lacked the authority to wait until after the hearing before suspending the plaintiff's license.

In moving to dismiss, the defendants argue that "plaintiff bases his claims against Commissioner Joshi and Deputy Commissioner Fromberg solely on their position[s] of authority and makes no specific factual allegations whatsoever that they were involved in the underlying summary suspension." Defs.' Br. 19. And as for Akinlolu and Wheeler, the defendants argue that "it was objectively reasonable for each of them to believe that they were not violating established federally protected rights" and thus that they are entitled to qualified immunity. *Id.* at 21.[15]

As to Joshi and Fromberg, the defendants are correct. There is no allegation in the complaint connecting Fromberg to the license suspension, and the only allegation regarding Joshi's presuspension conduct is that "the chairperson made *no* determination that Mr. El Boutary's licensure presented any threat" (Am. Compl. ¶ 36 (emphasis added)).[16] The procedural-due-process claims against Joshi and Fromberg must therefore be dismissed. That said, at the administrative hearing, Wheeler himself stated that someone "higher up" than Akinlolu might have made the decision to suspend the plaintiff's license. *See* Hr'g Tr. 16. In light of that evidence, the dismissal of these claims against Joshi and Fromberg is without prejudice.

As for the other individual defendants, "it has long been settled that due process generally requires a state to afford its citizens 'some kind of hearing' prior to depriving them of" property. *Velez v. Levy*, 401 F.3d 75, 101 (2d Cir. 2005). Reasonable TLC officials thus "should have been aware that the failure to give an adequate [presuspension] hearing [would] violate[] the Fourteenth Amendment" (*id.*), particularly where those officials allegedly "concocted" the basis for the plaintiff's deprivation in the first place (Am. Compl. ¶ 51).

---

[15] The defendants do not argue that the claim must be dismissed against the city.

[16] Indeed, the plaintiff's contention is that "the decision to suspend was made by Mr. Akinlolu." Am. Compl. ¶ 43.

Taking the allegations in the complaint as true, I find that Akinlolu and Wheeler are not entitled to qualified immunity, and so the plaintiff's procedural-due-process claims against them may proceed.[17]

## C.  Fair Warning and the TLC Regulations

The plaintiff also brings due-process claims of another sort: he claims that he was denied "fair warning of the law" because the TLC regulations gave him no "reason to believe his license could be suspended for a first service refusal." Pl.'s Br. 19–20. And he asserts, in what he sets forth as a separate claim, that because TLC "rules do not permit license suspension for a first service refusal offense," "the City, via its agency the TLC, violated local law." *Id.* at 20.

At all times pertinent to this action, section 68-15 of the TLC regulations stated that the TLC "Chairperson can summarily suspend a License if the Chairperson believes that continued licensure would constitute a direct and substantial threat to public health or safety, pending revocation proceedings." 35 N.Y.C.R.R. § 68-15(a)(1).[18] The regulations went on to state that "[s]uch direct and substantial threats to public health or safety would include but are not limited to: . . . (B) Any act, as prohibited by these Rules, of . . . threat against a person,

---

[17] The defendants also argue, in a footnote, that the plaintiff's request for punitive damages should be dismissed. Defs.' Br. 18 n.5 (citing *Ciraolo v. City of New York*, 216 F.3d 236, 238 (2d Cir. 2000)). *Ciraolo* explains that "*municipalities* are immune from punitive damages under § 1983" except "where 'the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights.'" 216 F.3d at 238 (emphasis added) (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267 n.29 (1981)). Here, the plaintiff is seeking punitive damages from the individual defendants, not from the city. *See* Am. Compl. at 16. Punitive damages against an individual defendant "may be awarded in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). I see no reason to dismiss the request for punitive damages at this time.

[18] The regulation has since been amended, principally to add additional prohibited conduct. *See* Notice of Promulgation of Rules, 145 N.Y. City Rec. 5532 (Oct. 12, 2018). The amendment is irrelevant to this proceeding.

harassment, abuse, or use of physical force." *Id.* The crux of the plaintiff's argument is that "[t]here was no allegation" that he "engaged in . . . threats, harassment, or physical force." Pl.'s Br. 20. Rather, the plaintiff argues, his conduct amounted to nothing more than a "service refusal." *Id.* at 19.

Although the plaintiff presses this argument both as a constitutional void-for-vagueness claim and as a claim that the defendants violated city regulations, both claims are predicated on precisely the same set of allegations: the defendants summarily suspended his license based on conduct for which TLC regulations prescribe a lesser penalty. But the regulations were not vague. And insofar as the plaintiff seeks to hold the defendants liable for violating TLC regulations, he lacks a private right of action. I dismiss both claims.

### 1. *The plaintiff has not stated a claim that the regulation is vague.*

The plaintiff has not made a vagueness argument. "[T]he due process doctrine of vagueness is designed to ensure that, before risking a deprivation of liberty or property, a person have fair notice of the type of conduct that is prohibited . . . ." *Piscottano v. Murphy*, 511 F.3d 247, 280 (2d Cir. 2007). The Supreme Court has "expressed greater tolerance" for vagueness in the civil context "because the consequences of imprecision are qualitatively less severe." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982). As such, "a regulation need not achieve 'meticulous specificity,' which would come at the cost of 'flexibility and reasonable breadth.'" *Piscottano*, 511 F.3d at 280 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). "Given [that] deferential standard," in *Padberg*, Judge Dearie declined to find unconstitutionally vague a provision of the TLC rules that prohibited acts "against the best interests of the public." 203 F. Supp. 2d at 287; *see also Perez v. Hoblock*, 368 F.3d 166, 179 (2d Cir. 2004) (rejecting vagueness challenge to prohibition of conduct "detrimental to the best interests of racing").

Section 68-15(a)(1)(B), in contrast, indisputably spoke in more concrete terms. Indeed, the plaintiff does not identify which if any of the terms in the regulation he finds vague or indefinite. Rather, he asserts that he had no notice that the regulation would be applied against him, *because he had not violated it*—or even allegedly violated it. *See* Pl.'s Br. 20 ("[T]here is nothing in any TLC [regulation] that would give [the plaintiff] fair warning that he might be suspended based on the conduct alleged—even if guilty as charged."); *see also id.* (arguing that he didn't violate regulations "even if [he] cursed or yelled, even if he acted based on his passengers' sexual orientation"). At bottom, the plaintiff is arguing that his suspension violated TLC rules, not that the rules were vague. Because the regulation was not unconstitutionally vague, and because the plaintiff does not seriously argue otherwise, I grant the defendants' motion as to the plaintiff's vagueness claim.

### 2. The TLC regulations do not afford the plaintiff a private right of action.

To the plaintiff's argument that the defendants violated TLC regulations, the defendants respond that "plaintiff's TLC license was not summarily suspended for a service refusal" but for allegedly "ordering two passengers out of his vehicle mid-trip because of their sexual orientation, initiating an altercation with them on the street, and attempting to grab a passenger's cell-phone from her hand" (Defs.' Opp'n 9–10), and the defendants specifically assert that "the predicate for plaintiff's summary suspension was an allegation of abusive and harassing behavior" (Defs.' Reply 4, ECF No. 34). The defendants make no attempt in their briefing, however, to identify which aspects of the plaintiff's alleged conduct constituted abuse or harassment. *But see* Notice of Settlement Conf. & Pet. 2 ("[R]espondent threatened, harassed, and abused a passenger by yelling and cursing at the passenger.").[19] Yet I need not

---

[19] The defendants do not argue in their briefing that the plaintiff's conduct included a "use of physical force" (§ 68-15(a)(1)(B)) even though the record reveals that on June 12, 2018, the TLC had charged that the

engage in a textual analysis of the regulation, because I find that the law does not grant the plaintiff a private right of action to sue on this basis.[20]

New York law provides that the existence of an implied private right of action depends on "three factors: '(1) whether the plaintiff is one of the class for whose particular benefit the [regulation] was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme.'" *Schlessinger v. Valspar Corp.*, 686 F.3d 81, 87 (2d Cir. 2012) (quoting *Sheehy v. Big Flats Cmty. Day, Inc.*, 541 N.E.2d 18, 20 (N.Y. 1989)).

The first two *Sheehy* factors do not support a private right of action here. The rule in question—allowing "summary suspension" of licenses in response to "direct and substantial threats to public health or safety" (§ 68-15(a)(1))—was clearly enacted for the benefit of the taxi-riding public, as well as pedestrians and other drivers on the road, not for the benefit of taxi drivers. And the purpose of the rule was to allow the TLC to take dangerous for-hire-vehicle drivers out of service quickly, not to provide those drivers with substantive rights.[21] This case is thus analogous to *Lesesne v. Brimecome*, 918 F. Supp. 2d 221 (S.D.N.Y. 2013), where the court ruled that a statute protecting individuals who reported medical misconduct was enacted not for the benefit of complained-of doctors but for the benefit of those complaining about doctors. *See id.* at 229. And "relatedly," the court observed, granting doctors a private

_____

plaintiff "used physical force against a passenger by grabbing at that passenger[']s phone, and swinging his hand at the passenger" (Notice of Settlement Conf. & Pet. 2–3).

[20] This holding is consistent with holdings of New York appellate courts (*see, e.g.*, *El-Nahal v. FA Mgmt., Inc.*, 5 N.Y.S.3d 201, 203 (App. Div. 2015) ("[A] private civil right of action may not be implied from [the TLC's] regulatory scheme.")), and I have found no authority to the contrary.

[21] The plaintiff's protection against summary suspension of his license in cases not requiring emergency action ultimately lies in the Due Process Clause, not in the benevolence of the Taxi and Limousine Commission. *Cf. Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981) (observing that Supreme Court has allowed "exception[s] to the normal rule that due process requires a hearing prior to deprivation of a property right" in "emergency situations" such as "to protect the public health and safety").

right of action to sue over complaints would be "*counter* to the legislative purpose [of encouraging complaints] due to the likelihood that it would chill such complaints." *Id.* In much the same way, section 68-15 of the TLC regulations was not enacted to benefit for-hire-vehicle drivers, and allowing such drivers to challenge their license suspensions in court would, if anything, tend to thwart the objective of suspending dangerous drivers' licenses.

The plaintiff fares no better under the third *Sheehy* factor. Where, as here, a rule is administratively enforced, the question under the third factor is "whether, in addition to administrative enforcement, an implied private right of action would be consistent with the legislative scheme." *Uhr ex rel. Uhr v. E. Greenbush Cent. Sch. Dist.*, 720 N.E.2d 886, 890 (N.Y. 1999). That standard can be met where, for example, a statute "creates specific rights" and "provides an easily determinable standard for violations" such that "the determination of a violation and the calculation of resulting damages do not require any special agency expertise." *Maimonides Med. Ctr. v. First United Am. Life. Ins. Co.*, 981 N.Y.S.2d 739, 748 (App. Div. 2014). Section 68-15, by contrast, grants drivers no rights—except to a postsuspension hearing (*see* § 68-15(a)(2)*)*—and by its terms commits its enforcement to agency discretion. According to the rule, the TLC "Chairperson can summarily suspend a License *if the Chairperson believes* that continued licensure would constitute a direct and substantial threat to public health or safety." § 68-15(a)(1) (emphasis added). Though some prohibited acts are specifically enumerated, the regulation provides that the TLC chair is "not limited" in the types of conduct for which she may summarily suspend licenses. *Id.* With no fixed standard against which to rule, a court could do nothing more than substitute its judgment for the TLC chair's. I see nothing in the regulations that suggests that that would be consistent with the legislative scheme. *Cf. Desmangles v. Woodside Mgmt., Inc.*, 968 N.Y.S.2d 454, 455 (App. Div. 2013) ("Upon review of

the TLC's legislative scheme and detailed self-enforcement provisions, we conclude that plaintiff has no private right of action . . . .").

Because none of the *Sheehy* factors support an implied private right of action for the plaintiff, the plaintiff's claim that the defendants violated TLC regulations must be dismissed.

## D. Defamation

Finally, the defendants have moved for judgment on the pleadings as to the plaintiff's claim that he was defamed in statements that Fromberg made to the media. Under New York law, the elements of defamation are: "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Thorsen v. Sons of Nor.*, 996 F. Supp. 2d 143, 163 (E.D.N.Y. 2014) (alteration in original) (quoting *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010)). "Because the falsity of the statement is an element of the defamation claim, the statement's truth or substantial truth is an absolute defense." *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 42 (App. Div. 2014). The defense of substantial truth means that "an alleged libel is not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to that allegation." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 302 (2d Cir. 1986). Finally, "[i]n evaluating whether a cause of action for defamation is successfully pleaded," I consider "the context of the entire statement or publication as a whole." *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (App. Div. 1999) (citing *Silsdorf v. Levine*, 449 N.E.2d 716 (N.Y. 1983)).

The plaintiff alleges that Fromberg made two defamatory statements about him, one to the New York Post and the other to CNN. *See* Am. Compl. ¶ 30. The first such statement, made to the Post, was: "[A] driver is most definitely not allowed to do such a thing. There is

a list of circumstances that are grounds for refusing service to a passenger, and what happened is most definitely not among them." Press Reports 7 (alteration in original); *accord* Am. Compl. ¶ 30. The second statement, made to CNN, was: "This blatantly discriminatory behavior described by the complainant is repugnant, and will not be tolerated in the City of New York." Press Reports 11; *accord* Am. Compl. ¶ 30.

The sole argument that the defendants raise about these statements is that they are true or substantially true. *See* Defs.' Br. 24–25.[22] And as to the latter statement, I agree. The statement refers to the "behavior described by the complainant" and does not explicitly mention the plaintiff in any way. Press Reports 11. The plaintiff argues that the "essence and substance" of the statement "is that Mr. El Boutary is a bigot who acted against his passengers out of a homophobic animus." Pl.'s Opp'n 8. But Fromberg here has said nothing at all about the plaintiff; instead, he is characterizing the passengers' complaint. What is more, Fromberg's statement was made in the context of his also stating that the TLC "reached out to [the passengers] immediately and commenced an investigation" (Press Reports 11), thereby strengthening the inference that his comments pertained to what the TLC had been told by the passengers and not what had actually occurred.

The same cannot be said of Fromberg's other comment. Fromberg allegedly told the New York Post that "what happened is *most definitely* not" "grounds for refusing service to a passenger." Am. Compl. ¶ 30 (emphasis added); *see also* Press Reports 7. The defendants argue that, "in context, earlier statements attributed to him clearly indicate that Deputy Commissioner Fromberg is responding to the allegations made by the complaining passengers." Defs.' Br. 25. But there are no other statements attributed to Fromberg in the

---

[22] The defendants also argue that a third statement was not adequately pleaded (*see* Defs.' Br. 24), but the plaintiff never alleged that that third statement was defamatory (*see* Am. Compl. ¶¶ 29–30), and it is not part of the plaintiff's defamation claim.

Post's article. *See* Press Reports 6–7. And referring to "what happened" instead of "what the passengers claim happened" is not a "fine and shaded distinction[ ]" that would make no difference to "[t]he average reader" (*Guccione*, 800 F.2d at 302–03 (quoting *Cafferty v. S. Tier Publ'g Co.*, 123 N.E. 76, 78 (N.Y. 1919)). Rather, it is the difference between, on the one hand, communicating that an investigation is ongoing and that the facts are unknown and, on the other, strongly implying that the plaintiff discriminated against the passengers on the basis of their sexual orientation. Assuming the truth of the allegations in the complaint, I cannot say that Fromberg's statement to the Post was substantially true.[23] I therefore deny the defendants' motion as to the defamation claim with respect to the statement to the Post but grant it with respect to the statement to CNN.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion is denied, and the defendants' motion is granted in part and denied in part. Specifically, the plaintiff's state and federal procedural-due-process claims (the first and third causes of action) against defendants Joshi and Fromberg are dismissed without prejudice; the plaintiff's fair-warning claim and claim that the defendants violated the TLC regulations (the second and fourth causes of action) are dismissed against all defendants; and the plaintiff's defamation claim (the fifth cause of action) is dismissed with respect to the statement allegedly made to CNN. The remainder of the plaintiff's claims survive.

---

[23] The defendants do not argue that Fromberg's statements to the press were privileged. Although "statements made to a newspaper reporter" by a city official performing his duties may be "protected by a qualified privilege" (*Lee v. City of Rochester*, 677 N.Y.S.2d 848, 851 (App. Div. 1998)), such a privilege is overcome when the defendant speaks with "reckless disregard of whether [his statement] was false or not" (*Liberman v. Gelstein*, 605 N.E.2d 344, 349–50 (N.Y. 1992) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964))).

So ordered.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:       December 26, 2018
               Brooklyn, New York